Jesse D. Franklin-Murdock (10778)
SWEIGART MURDOCK, LLP
500 Ala Moana Blvd., Ste. 7400
Honolulu, HI 96813
Tel: (415) 873-0123
Fax: (877) 890-0791
jesse@sm-llp.com

Adam K. Mortara*
LAWFAIR LLC
40 Burton Hills Blvd., Ste. 200
Nashville, TN 37215
(773) 750-7154
mortara@lawfairllc.com

*pro hac vice forthcoming

Thomas R. McCarthy*
Patrick N. Strawbridge*
J. Michael Connolly*
Cameron T. Norris*
R. Gabriel Anderson*
Julius I. Kairey*
Ryan M. Proctor*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
patrick@consovoymccarthy.com
mike@consovoymccarthy.com
cam@consovoymccarthy.com
gabe@consovoymccarthy.com
julius@consovoymccarthy.com
ryan@consovoymccarthy.com

*Counsel for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS; E.S., by and through her next friend and mother, K.S.; and K.S., <br><br> *Plaintiffs*, <br><br> v. <br><br> TRUSTEES OF THE ESTATE OF BERNICE PAUAHI BISHOP d/b/a KAMEHAMEHA SCHOOLS, <br><br> *Defendant*. | Case No. _____ <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

1.      Kamehameha Schools—the wealthiest, elite, prestigious private school in Hawaii—admits to giving a "preference" to "applicants of Hawaiian ancestry." Far more than a "preference," Kamehameha admits *zero* students who lack native Hawaiian ancestry. It considers non-natives only if, after accepting all native Hawaiians, it still has open seats—a condition that Kamehameha makes sure never holds.

2.      A preference for native Hawaiians is "race-based." *Rice v. Cayetano*, 528 U.S. 495, 517 (2000). Admission to private school, including one that gets no federal funds, involves contracts. *Runyon v. McCrary*, 427 U.S. 160, 168 (1976). And racial discrimination in contracting is illegal under 42 U.S.C. §1981. That the discrimination follows a princess's will is no defense to §1981, any more than when another part of her will (that all teachers be Protestant) was deemed illegal under Title VII. *EEOC v. Kamehameha Sch.*, 990 F.2d 458, 466 & n.18 (9th Cir. 1993).

3.      Nothing about training future leaders, or preserving Hawaii's unique culture, requires Kamehameha to block its students from learning beside children of different ancestries—Asian, black, Hispanic, or white. Segregation is bad. *Brown v. Bd. of Ed.*, 347 U.S. 483, 494 (1954). "Separate cannot be equal." *SFFA v. Harvard*, 600 U.S. 181, 203 (2023). And "[t]he time for making distinctions based on race" in education has "passed." *Id.* at 204.

4.      Kamehameha's race-based admissions policy has been challenged under §1981 before. In an 8-7 decision, the Ninth Circuit agreed that the policy is race-

based and contractual, but upheld it under §1981's supposed "affirmative action" exception. *Doe v. Kamehameha Sch.*, 470 F.3d 827 (9th Cir. 2006) (en banc) ("*Doe I*").

5.  While the Ninth Circuit's 8-7 decision was wrong in 2006, it certainly cannot shield Kamehameha today. Its legal reasoning was abrogated by the Supreme Court in *Harvard*. And its factual reasoning is stale: Per the Ninth Circuit, Kamehameha has an ongoing duty to justify its use of race with "current" data, and to use race "only for so long as is necessary"—conditions that, now 20 years later, Kamehameha cannot satisfy. 470 F.3d at 846. If the Ninth Circuit meant to exempt Kamehameha from satisfying those conditions by carving it out of §1981 entirely, then that carveout is unconstitutional.

6.  Kamehameha's race-based admissions policy is illegal. It harms families whose children cannot fairly compete for admission because they were born in the wrong family tree. This Court should order Kamehameha to desegregate with all deliberate speed.*

---

*  This case is related to *Students for Fair Admissions, et al. v. Kamehameha Schools* (*SFFA I*), No. 1:25-cv-450-MWJS-RT (D. Haw. filed Oct. 20, 2025). Simultaneously with the filing of this complaint, the plaintiffs in *SFFA I* are filing a motion for leave to file a third amended complaint adding E.S. and K.S. as plaintiffs and incorporating the new allegations made in this complaint. If that motion is granted, Plaintiffs here plan to voluntarily dismiss this action under Fed. R. Civ. P. 40(a)(1)(A). Plaintiffs file this separate action only to preserve their rights in the event that the motion for leave in *SFFA I* is denied, given that the Defendant in *SFFA I* is opposing that motion.

**PARTIES**

7.    Plaintiff Students for Fair Admissions is a voluntary membership organization formed for the purpose of defending human rights and civil liberties, including the right to be free from illegal racial discrimination, through litigation and other lawful means. SFFA and its members believe that racial preferences in school admissions are unfair, unnecessary, and illegal. SFFA is recognized by the IRS as a 501(c)(3) tax-exempt nonprofit.

8.    SFFA is a traditional, genuine membership association. Founded in 2014, SFFA has grown to over 19,000 members. SFFA has vindicated many members' rights in many federal cases, including its successful litigation against Harvard and UNC. *See Our Cases*, SFFA, studentsforfairadmissions.org/our-cases.

9.    SFFA brings this lawsuit in a representational capacity on behalf of its members who would have standing to sue on their own. All of SFFA's standing members voluntarily joined the organization, support its mission, authorized SFFA to represent their rights in this case, receive updates and can give input and direction on this case, and are represented by SFFA in good faith.

10.    Plaintiff E.S. is a minor. A non-native Hawaiian, she applied to Kamehameha twice. Her application was denied both times.

11.    Plaintiff K.S. is E.S.'s mother. She signed the contracts with Kamehameha that let her daughter apply there. K.S. sues to vindicate her own rights. She also sues as representatives of E.S., her minor child.

12.    Defendant, Trustees of the Estate of Bernice Pauahi Bishop d/b/a Kamehameha Schools, is a system of private schools in Hawaii. It is a 501(c)(3) tax-exempt nonprofit. It adopted and implements the race-based admissions policy at issue here.

## JURISDICTION & VENUE

13.    Subject-matter jurisdiction exists under 28 U.S.C. §1331 because this case arises under 42 U.S.C. §1981, a federal statute.

14.    Venue is proper under 28 U.S.C. §1391(b) because all defendants reside here and Kamehameha administers the challenged policy here.

## BACKGROUND

**I.     Kamehameha Schools uses a racial preference in admissions that, in effect and by design, ensures only native Hawaiians are admitted.**

15.    Kamehameha Schools is the largest private landowner in Hawaii, with holdings spanning 364,000 acres. Kamehameha is also the largest educational trust in the country, with an endowment worth over $15 billion.

16.    Kamehameha educates students from kindergarten through twelfth grade, plus preschoolers. Kamehameha has three campuses: Hawaii, Kapalama, and Maui.

17.     Today, Kamehameha educates around 6% of the island's native Hawaiians—5,400 K-12 students (100% of whom are native Hawaiian) out of 86,000 school-aged native Hawaiians. When its policy was last challenged, Kamehameha educated around 7% of the island's native Hawaiians—4,800 K-12 students out of 70,000 school-aged native Hawaiians. *Doe I*, 470 F.3d at 832.

18.     Kamehameha has no special-education program. Its rigorous admission standards exclude students with serious mental disabilities.

19.     Admission to Kamehameha is highly "competitive." The number of children seeking admission has been "increasing" every year.

20.     Whether and when children can apply depends on their zip code and age. Generally, students in preschool can apply for kindergarten; and students in grades 3, 6, 8, 9, 10, and 11 can apply for the next grade up. An applicant cannot apply for the same grade level in two consecutive years.

21.     Kamehameha also allows "out-of-state applicants" to apply for grades 7-12.

22.     For the 2025-26 school year, the application window opened on August 15 and closed on September 30, 2025.

23.     To apply, parents use an online portal. Parents cannot use the portal unless they create an account. Creating an account requires parents to "read and

agree to" the "Kamehameha Schools Access Agreement." This contract contains a choice-of-law provision and a forum-selection clause:

By accepting this agreement, I certify the following:

- o I am 18 years of age or older, or possess legal parental or guardian consent, and am competent to enter into this Agreement.
- o I further agree that any lawsuit or claim against KS arising from or related to this application must be brought exclusively in the U.S. District Court for the District of Hawaii or in the state courts of the State of Hawaii. I hereby waive any jurisdictional, venue, or inconvenient forum objections to such courts. I further agree that any federal claims arising from or related to this application shall be governed exclusively by the federal law applied by the U.S. District Court for the District of Hawaii, and any state law claims shall be governed exclusively by the laws of the State of Hawaii, without reference to its conflict of law rules.

24.    After creating an account, parents must fill out a questionnaire. Students must also attend a test session on campus at Kamehameha and an in-person interview with Kamehameha staff.

25.    To submit the application, parents must sign the "Acknowledge, Consent, and Authorization." Among other obligations, this contract requires parents to "waive, release, and hold harmless" Kamehameha for mishandling the information disclosed in the application. It also requires parents to "waive any rights" to privacy or publicity, including "photographs" of the child, and to give Kamehameha the right to "use" this information for its own purposes. The Acknowledge warns that it's a binding contract: "**THE CONTENTS AND NATURE OF THIS AGREEMENT ARE CONTRACTUAL, NOT A MERE RECITAL**," and applying parents

"**AGREE TO BE BOUND BY ALL TERMS AND CONDITIONS CON-TAINED IN THIS AGREEMENT**."

26.     Once a child is accepted, that child cannot enroll at Kamehameha unless the parents sign the "Enrollment Contract/General Release." Among other binding obligations, this contract requires parents—"[i]n consideration for" Kamehameha supervising their child—to indemnify and waive their right to sue Kamehameha for certain injuries. It, too, stresses its contractual nature: "**THIS AGREEMENT IS A CONTRACT TO, AMONG OTHER THINGS, RELEASE THE KS PARTIES FROM LIABILITY AND TO INDEMNIFY THE KS PARTIES**."

27.     Before their child can enroll, parents also must sign the "KS Tuition Contract." That contract makes the parents agree, among other things, to "pay KS tuition" "in consideration for KS's enrollment of" their child. For the 2025-26 school year, the portion of tuition that parents must pay is $5,675, $6,983, or $12,934 per student—depending on campus and grade.

28.     When deciding which students to admit, Kamehameha admits to awarding a "preference" to "applicants of Hawaiian ancestry"—*i.e.*, children who qualify as native Hawaiian. Native Hawaiian means the child "descended from the aboriginal people who exercised sovereignty in the Hawaiian Islands prior to 1778." *Doe I*, 470 F.3d at 832; *accord* Doc.32 at 3-4 (same).

29.     To receive this preference, applicants "must verify [their] Hawaiian ancestry" "by registering with the Kamehameha Schools Hoʻoulu Verification Services." Applicants also must let Kamehameha "trace" their "Hawaiian ancestry" by submitting birth certificates.

30.     Kamehameha's preference is a rigid, sequencing-based quota. Kamehameha will "grant admission to any" native Hawaiian "before admitting other applicants." *Doe v. Kamehameha Sch.*, 596 F.3d 1036, 1039 (9th Cir. 2010) ("*Doe II*"). In other words, no non-native can be admitted unless, after all native Hawaiians have been admitted, Kamehameha still has open seats. In effect and by design, this policy ensures that non-native Hawaiians are never admitted.

31.     From at least 1966 to 2009, "only two" non-native Hawaiians ever attended Kamehameha. *Doe II*, 596 F.3d at 1039. Both exceptions prove the rule that Kamehameha does not admit non-natives.

a. One of the two non-natives was admitted in 2003, after saying he was native on his application because his mother was adopted by a native Hawaiian. When Kamehameha found out the child was not (by its lights) truly native, it revoked his admission. He attended only because he sued Kamehameha and won an injunction.

b. The other non-native student was admitted in 2002 when, due to an "unusually small applicant pool" for the Maui campus, a seat remained

open after all native Hawaiians were admitted. When the non-native student's admission was discovered, angry protests erupted. The trustees vowed to "carefully review our admissions process" to avoid a repeat of "the situation on Maui." A trustee said "[w]e screwed up major," and the board "stressed that this would not happen again."

32.    After these events, Kamehameha "waived the application fee and the minimum-test-score requirement, effectively ensuring that there would never again be an insufficient number of qualified Native-Hawaiian applicants." *Doe II*, 596 F.3d at 1039.

33.    Today, "the number of applications received exceeds the number of available spaces anywhere from a ratio of 3:1 to 17:1, depending on the campus and grade level." Those applications are nearly all from native Hawaiians, as non-natives do not apply because they understand that their odds of admissions are zero.

34.    Kamehameha has not admitted a single non-native Hawaiian in at least 15 years. For Kamehameha's most competitive campus, Kapalama, the school has never admitted a non-native Hawaiian.

35.    Students who are academically qualified to attend Kamehameha, but not initially admitted, are put on a waitlist. Students are regularly admitted off the waitlist, and students on the waitlist are not denied admission to Kamehameha until the admissions process ends on December 31. Consistent with its "preference" for

- 10 -

native Hawaiians, Kamehameha offers admission to native Hawaiians on the waitlist before offering admission to any non-native Hawaiians on the waitlist.

36.    Kamehameha says its race-based admissions policy is required by Princess Bernice Pauahi Bishop's will. Her will, in relevant part, directs the trustees to "devote a portion of each year[']s income to the support and education of orphans, and others in indigent circumstances, giving the preference to Hawaiians of pure or part aboriginal blood." Though that provision says nothing about an admissions preference for native Hawaiians, Pauahi's husband later wrote that the princess "'intended that … those of her race should have preference.'" *Doe I*, 470 F.3d at 832; *accord* 295 F. Supp. 2d 1141, 1155 (quoting letters from Pauahi's husband saying "'it was intended and expected that Hawaiians having aboriginal blood would have a preference'" and that "'it is understood by the Trustees that only those having Native blood are to be admitted at present'").

37.    Pauahi's will also directed that "the teachers of [Kamehameha] schools shall forever be persons of the Protestant religion." But that portion of the will was deemed illegal religious discrimination under Title VII because Kamehameha is a "secular" school. *EEOC*, 990 F.2d at 459. Federal law trumps state law, so "[t]he fact that the Protestant-only requirement appears in Mrs. Bishop's will" did not make the discrimination legal. *Id.* at 466. The Ninth Circuit was confident that the "Hawaii courts" would "approve an involuntary departure" from the will "to comply" with

federal law, like the trustees did in the 1940s when they "approved the merger of the separate boys and girls schools established by the will." *Id.* at 467 n.18.

38.    In fact, "it is clear that Pauahi left to her Trustees the discretion 'to regulate the admission of pupils.'" 295 F. Supp. 2d 1141, 1154 (D. Haw. 2003). Kamehameha itself says it will stop considering race in admissions "to the extent" the practice is not "permitted by law."

## II.    Kamehameha's policy survives prior challenges because families are paid or intimidated to drop their suits.

39.    In 2003, a family challenged Kamehameha's race-based admissions policy under §1981. The plaintiff, a minor child, proceeded under the pseudonym "John Doe."

40.    After the parties cross-moved for summary judgment, the district court ruled that the plaintiff had made out "a prima facie case of purposeful racial discrimination in violation of §1981" and rejected the notion that Kamehameha had any "First Amendment" defense. 295 F. Supp. 2d at 1162 & n.18. But the district court concluded that Kamehameha's admissions policy was a valid "remedial plan." *Id.* at 1165-72.

41.    On appeal, a panel of the Ninth Circuit reversed. Kamehameha's race-based admissions was not a valid remedial plan, the panel held, because it "consciously and conspicuously denies admission to all members of the non-preferred race." 416 F.3d 1025, 1041 (9th Cir. 2005).

42.     The full Ninth Circuit granted rehearing en banc. On an 8-7 vote, it affirmed the district court.

43.     The en-banc majority held that admission to Kamehameha involves contracts. "[B]ecause the schools charge tuition," there is "bargained-for exchange." *Doe I*, 470 F.3d at 836 n.9.

44.     The majority also "accept[ed] that 'Native Hawaiian'—like 'Negro'—is a racial classification," as the Supreme Court has "h[eld]" in related contexts. *Id.* (citing *Rice*, 528 U.S. at 514).

45.     But the Ninth Circuit held that §1981 contains an "affirmative action" exception. *Id.* at 838-39. In a pair of older cases, the Supreme Court had recognized an affirmative-action exception under Title VII. *See Johnson v. Transportation Agency*, 480 U.S. 616, 626 (1987); *United Steelworkers v. Weber*, 443 U.S. 193, 208 (1979). Other courts have extended that *Johnson*/*Weber* exception to §1981 in cases involving employment contracts, reasoning that "[t]o open the door for such plans under [T]itle VII and close it under section 1981 would make little sense." *Setser v. Novack Inv. Co.*, 657 F.2d 962, 967 (8th Cir. 1981) (en banc). Under the *Johnson*/*Weber* exception, employers can have a race-based affirmative-action plan if they (1) prove a "'manifest imbalance'" in their work force, (2) do not "'unnecessarily trammel'" the rights of the non-preferred class or create an "'absolute bar'" to

their advancement, and (3) do "no more than is necessary" to correct the imbalance. *Doe I*, 470 F.3d at 840.

46.  Though Kamehameha's admissions policy has nothing to do with employment, the Ninth Circuit held that §1981 also contains an affirmative-action exception for schools—one that's even laxer than the exception for employers. To justify this laxer test, the majority relied on *Grutter*: It stressed the "deference" that *Grutter* gave schools, "rooted in the First Amendment," on questions of educational autonomy. *Id.* at 841 (citing *Grutter*, 539 U.S. at 328, 329). And it relied on *Grutter*'s diversity rationale to explain why schools should be able to focus externally on the racial makeup of society, rather than internally on the racial makeup of their students. *Id.* at 841-42 (citing *Grutter*, 539 U.S. at 331, 332). Under the Ninth Circuit's modified test, a school can have a race-based affirmative-action plan if—with respect to "the community as a whole"—the school (1) proves that "specific, significant imbalances in educational achievement presently affect" the preferred race, (2) does not "unnecessarily trammel" the rights of non-preferred races or "create an absolute bar" to their advancement, and (3) does "no more than is necessary to remedy the imbalance." *Id.* at 842.

47.  The majority held that, from 2002-2005, Kamehameha's admissions policy satisfied this modified test for a valid affirmative-action plan. *See id.* at 834 n.5 (by the time of en banc, plaintiff was seeking "only damages" based on his past

- 14 -

rejected applications); 295 F. Supp. 2d at 1157 (plaintiff applied for admission for the school years 2002-03, 2003-04, and 2004-05).

48.    On the first requirement, the Ninth Circuit found a "manifest imbalance in current educational achievement" between native and non-native children in Hawaii. *Doe I*, 470 F.3d at 843. Relying on Kamehameha's 2005 study, *Ka Huakai*, the Ninth Circuit cited statistics suggesting that native Hawaiians "score lower on standardized tests," are "more likely to be in special education classes," are "more likely to be absent from school," are "more likely to attend poor-quality schools," are "the least likely … to graduate from high school," and "are less likely … to attend college." *Id.* at 843 (citing *Ka Huakai, 2005 Native Hawaiian Educational Assessment* 229, 261, 252, 285, 118-19 (*2005 Ka Huakai*)).

49.    Specifically, per the 2005 *Ka Huakai* report, native Hawaiians' average scores on standardized reading tests were 9 to 12 percentage points lower than the statewide average. *2005 Ka Huakai* 261. Native Hawaiians were enrolled in special-education classes at a rate of 18.5 percent, compared to 10.9 percent of non-natives. *Id.* at 278. Native Hawaiians missed 20+ days of school at a rate of 17.2 percent, compared to 9.8 percent of non-natives. *Id.* at 281. Native Hawaiians attended good schools at a rate of 59.1 percent, compared to 78.2 percent of non-natives. *Id.* at 252. Native Hawaiians graduated from high school on time at a rate of 69.4 percent, compared to the statewide average of 76.6 percent. *Id.* at 285. And native Hawaiians

enrolled in college at a rate of 25.6 percent, compared to the statewide average of 32.5 percent. *Id.* at 119.

50.    Kamehameha has not updated its report since 2021. Per the 2021 report (which uses data no more recent than 2018), native Hawaiians are doing better on some statistics and worse on others. *See Ka Huakai, Native Hawaiian Educational Assessment 2021* (*2021 Ka Huakai*). The rate of native Hawaiians enrolled in special-education classes decreased from 18.5 to 15 percent, though the statewide average also decreased from 10.9 to 10 percent. *Id.* at 436. The rate of native Hawaiians who graduate from high school on time increased from 69.4 to 79 percent, though the statewide average also increased from 76.6 to 83 percent. *Id.* at 481. And the rate of native Hawaiians enrolled in college increased from 25.5 to 31 percent, though the statewide average also increased from 32.5 to 35 percent. *Id.* at 212. As for chronic absenteeism, the rate of native Hawaiians with excessive absences increased from 29 to 30 percent, while the statewide average decreased from 21 percent to 20 percent. *Id.* at 469. And the gap in language-arts proficiency widened to 16 percentage points—with 34 percent of native Hawaiians proficient, compared to 50 percent statewide. *Id.* at 454. No data on the percentage of native Hawaiians attending good schools is provided.

51.    On the second requirement for a valid affirmative-action plan, the Ninth Circuit held that Kamehameha's admissions policy did not "unnecessarily trammel"

- 16 -

or create an "absolute bar" to non-natives. *Doe I*, 470 F.3d at 844-45. Though it admitted that Kamehameha admits effectively zero non-natives, the majority said "nothing in the record suggests that educational opportunities in Hawaii are deficient" for non-natives. *Id.* at 844. And it said that congressional legislation from "2002" recognized native Hawaiians' "present, severe inequalities in educational achievement." *Id.* at 845. The Ninth Circuit also downplayed the expectations of non-natives because no one is "guaranteed admission" to Kamehameha and the school's racial preference "has remained constant" for "118 years." *Id.*

52.    On the third requirement, the Ninth Circuit held that Kamehameha's race-based admissions policy does "no more than necessary" to correct the manifest balance. *Id.* at 845-46. Though it held that the use of race must "be 'temporary,'" the Ninth Circuit rejected the notion that Kamehameha needed an "explicit or immediately foreseeable end date." *Id.* at 846. For this point, it relied again on *Grutter*, which supposedly let universities use race in higher education for "25 more years" (for a total of "50 years"). *Id.* at 845-46. Kamehameha's policy was temporary because the school promised to use race "only for so long as is necessary to remedy the current educational" disparities. *Id.* at 846. And non-natives could be admitted if "the capacity of the Schools' programs increases" and more seats are left open for non-natives. *Id.* at 845-46.

53.    After spending the bulk of its analysis explaining why Kamehameha satisfied the affirmative-action exception to §1981, the Ninth Circuit's opinion ends with a brief, additional section titled, "Alternatively, and in Addition, Congress Specifically Intended to Allow the Kamehameha Schools to Operate When, in 1991, It Re-enacted §1981." *Id.* at 847-49.

54.    In this section, the majority explained that Congress "reenacted §1981 in 1991." *Id.* at 847. "Most importantly," Congress had passed the Hawkins-Stafford Amendments in 1988, *id.* at 848, and a provision of those amendments awarded grants to "Kamehameha Schools" to continue working on a "model curriculum" for use in "public schools," Pub. L. 100-297 §4003(a) (Apr. 28). The Ninth Circuit said those amendments, plus other federal laws passed after 1991 that "favor[ed] remedial measures for Native Hawaiians," "inform our analysis of the validity of the Kamehameha Schools' admissions policy under §1981." 470 F.3d at 849. The majority concluded that "the most plausible reading of §1981" is that "Congress intended" for "a preference for Native Hawaiians, in Hawaii, by a Native Hawaiian organization, located on the Hawaiian monarchy's ancestral lands, be upheld." *Id.* at 849.

55.    If this part of the opinion is an alternative holding that carves out from §1981 some discrimination in favor of native Hawaiians, then the opinion does not address the constitutionality of that carveout. The Ninth Circuit stressed that the

- 18 -

plaintiff "brought no constitutional claims" and so its analysis was "only" about "Congress's intent." *Id.* at 847. Throughout the litigation, the parties did not "contes[t] the constitutionality of §1981" or "any" other congressional enactment, however interpreted, and the courts never considered or decided any constitutional question. 416 F.3d at 1034 n.3; 295 F. Supp. 2d at 1174 n.30.

56.     The en-banc majority opinion in *Doe I* was answered by strong dissents from Judges Bybee, Rymer, Kleinfeld, and Kozinski (variously joined by Judges O'Scannlain, Tallman, and Callahan).

57.     Bolstered by those dissents, the plaintiffs in *Doe I* petitioned for certiorari. Yet the parties "settled on what was very likely the day after the United States Supreme Court had acted on plaintiff John Doe's petition for certiorari." Grant, *Doe v. Kamehameha Schools: The Undiscovered Opinion*, 30 U. Haw. L. Rev. 355 (2008).

58.     After Kamehameha settled with the first group of parents, another group of parents quickly filed the same suit. The plaintiff in the first case had used a Doe pseudonym, with no objection from Kamehameha. But when the plaintiffs in the second case did the same thing, Kamehameha objected.

59.     Nevertheless, the district court in *Doe II* ruled that the plaintiffs had to disclose their real identities. 2009 WL 308351, at *7 (D. Haw. Feb. 6). When the

plaintiffs refused and had their case dismissed, a panel of the Ninth Circuit reluctantly affirmed under the abuse-of-discretion standard. 596 F.3d at 1046.

### III.    Plaintiffs are injured by Kamehameha's discrimination.

60.    SFFA has members who are ready and able to apply to Kamehameha Schools.

61.    Prior to this lawsuit, SFFA launched the website kamehamehanotfair.org. (SFFA launched similar websites before its successful lawsuits against Harvard, West Point, and others.) News spread quickly in Hawaii. *See, e.g.*, *Virginia-based Group Launches New Challenge to Kamehameha Schools Admissions Policy*, Hawaii News Now (Sept. 5, 2025), perma.cc/K7G3-B8GN; *Supporters Rally for Kamehameha Schools in Light of Newest Challenge to Admissions Policy*, Hawaii News Now (Sept. 12, 2025), perma.cc/FV2H-YU5L.

62.    Since the website's launch, SFFA's president, Edward Blum, has received a barrage of phone calls, emails, voicemails, and other submissions. The volume has been so large that he had to create a new email account and delist his personal phone number.

63.    The messages have been overwhelmingly hostile. *See, e.g.*, Doc.54-5 ¶¶12-15, *SFFA v. Kamehameha Schools* (*SFFA I*), No. 1:25-cv-450-MWJS-RT (D. Haw. Jan. 21, 2026); Doc.54-7, *SFFA I.*

64.     The vile, threatening, antisemitic comments and posts on social media about Edward Blum due to SFFA's efforts to challenge Kamehameha's admissions policy are too many to list and will proliferate as the case continues. *See, e.g.,* Doc.54-5 ¶¶16-18, *SFFA I.*

65.     Also in September 2025, a Hawaiian who is highly outspoken on political issues posted in support of SFFA and ending Kamehameha's race-based admissions. In the comments, a Hawaiian named Jason Hatzi threatened to assassinate the poster. *See* Doc.54-5 ¶22, *SFFA I.*

66.     In Blum's experience working with individuals, with SFFA, and with the other membership associations he leads (including the American Alliance for Equal Rights), keeping the membership of SFFA anonymous is vitally important to the organization. Based on Blum's experiences and discussions, many people would not join organizations like SFFA—let alone join and have SFFA vindicate their rights in court—without anonymity protections.

67.     A lifelong resident of Hawaii, E.S. believed she would be a great fit for Kamehameha Schools. E.S. has a strong academic background and is an accomplished athlete. She was particularly drawn to Kamehameha's culture of supporting student athletes.

68.     E.S. is multiracial. She is not native Hawaiian.

69.    In 2021, E.S. applied for admission to Kamehameha's Kapalama campus as a sixth grader, to enroll there in seventh grade. Her mother, K.S., created the online account and signed the contracts that Kamehameha requires from parents before their child can apply.

70.    E.S. timely completed her application to Kamehameha, attached all necessary materials, and completed the test and interview. E.S. scored well on Kamehameha's test.

71.    E.S. was denied admission to Kamehameha in 2022.

72.    In 2023, E.S. applied for admission to Kamehameha's Kapalama campus as an eighth grader, to enroll there her freshman year. K.S. created the online account and signed the contracts that Kamehameha requires from parents before their child can apply.

73.    E.S. timely completed her application to Kamehameha, attached all necessary materials, and completed the test and interview. E.S. scored well on Kamehameha's test.

74.    E.S. was again denied admission to Kamehameha in 2024.

75.    E.S. realized she had no chance of being admitted because she was not native Hawaiian. She was and remains deeply hurt by Kamehameha's discrimination against her based on her race, an accident of birth that she cannot control.

76.    K.S. was also hurt to see her daughter become the victim of racial discrimination and to miss a vital educational opportunity. K.S. encouraged her daughter to go through the time-consuming and involved process of applying to Kamehameha twice because of the opportunities she thought the school would provide. Yet Kamehameha discriminated against E.S. because of her ancestry—while failing to give K.S. and E.S. the full and equal benefits of the contracts that Kamehameha made K.S. sign.

77.    Had E.S. been admitted as a rising seventh grader, she would have attended Kamehameha for six years. Had she been admitted as a rising freshman, she would have attended Kamehameha for four years.

78.    E.S. is currently in tenth grade and is able and ready to apply again at the next opportunity, once a court orders Kamehameha to end its racial preference, to be equally open to non-native Hawaiians, and to undo the effects of its past discrimination. And if a court ordered adequate relief, E.S. would finish her schooling and graduate from Kamehameha.

79.    K.S. and E.S. are members of SFFA. They have authorized SFFA to represent their rights in this litigation. SFFA does so with the exception of their requests for compensatory and punitive damages, which K.S. and E.S. bring solely on their own.

80. K.S. and E.S. are using initials because E.S. is a minor, *see* Fed. R. Civ. P. 5.2(a), and using K.S.'s first and last name would necessarily reveal E.S.'s identity. Even after she turns 18 in 2028, the key events will have occurred while E.S. was a minor. And K.S. and E.S. are aware of the intense and widespread backlash leveled at anyone who supports SFFA in challenging Kamehameha's admissions policy, including the incidents detailed above and the many more that have occurred since this suit was filed. If their real names are revealed, K.S. and E.S. fear physical threats and violence against themselves, doxing of their personal information and home address, and retaliation against E.S. at school.

## CLAIMS FOR RELIEF

### COUNT I
### Kamehameha's Admissions Policy Fails Strict Scrutiny
### (42 U.S.C. §1981)

81. Plaintiffs incorporate and restate all their prior allegations here.

82. Section 1981 guarantees "[a]ll persons … the same right … to make and enforce contracts … as is enjoyed by white citizens." 42 U.S.C. §1981(a). At least as of 1991, the statute's ban on racial discrimination in contracting "includes" racial discrimination that affects "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." §1981(b).

83.    Section 1981 prohibits discrimination by "nongovernmental" actors like Kamehameha. §1981(c).

84.    Section 1981 authorizes equitable and legal relief. *Johnson v. Ry. Express Agency*, 421 U.S. 454, 459-60 (1975).

85.    Admission to Kamehameha involves contracts. *Doe I*, 470 F.3d at 836 n.9. To apply, parents must create an account and sign a contract that waives legal rights. To submit the application, parents must agree to another contract that waives privacy rights. To enroll, parents must sign another contract agreeing to indemnification and liability waivers. And Kamehameha makes parents pay tuition and sign a tuition contract—a contractual exchange of money for educational services. *See supra* ¶¶23-27.

86.    Kamehameha refuses to give applicants an equal chance to make these contracts based on race, and it makes these contracts but denies recipients equal benefits based on race. Its preference for native Hawaiians is race-based. *Doe I*, 470 F.3d at 836 n.9. And though its preference is a 100% quota, even a mere preference would require trigger §1981. *See Grutter*, 539 U.S. at 343.

87.    Race-based contracting violates §1981—either without exception, or at least if the defendant cannot satisfy strict scrutiny. In *Grutter* and *Gratz*, the Supreme Court held that Title VI and §1981 are "coextensive" with the Fourteenth Amendment, so a race-based admissions policy that fails strict scrutiny necessarily violates

Title VI and §1981. *Grutter*, 539 U.S. at 343; *Gratz v. Bollinger*, 539 U.S. 244, 276 n.23 (2003). And in *Harvard*, the Supreme Court held that this principle means strict scrutiny applies even if the defendant is a private school, *see* 600 U.S. at 198 n.2, thus abrogating the Ninth Circuit's contrary reasoning in *Doe I*.

88.   Kamehameha cannot satisfy strict scrutiny for many reasons, including:

a.   Kamehameha treats race as a "negative" for some applicants. *Harvard*, 600 U.S. at 219. Admission to Kamehameha is zero sum; applicants compete for a limited number of seats. *Supra* ¶19, ¶33. So by giving native Hawaiians a preference, Kamehameha treats race as a positive for native applicants and a "negative" for all others. *Harvard*, 600 U.S. at 219.

b.   Kamehameha uses racial "'quotas.'" *Id.* at 211. It does not use race "only as a 'plus'" in an individualized review of each applicant. *Id.* at 209. It "forthrightly admit[s] that as long as there are qualified students who possess at least some native Hawaiian ancestry, they will be admitted before even the most qualified of those who lack aboriginal blood." 416 F.3d at 1029. Kamehameha thus puts applicants on "'separate admissions tracks'" based on race—something that never satisfied strict scrutiny. *Harvard*, 600 U.S. at 211.

c. Kamehameha's use of race has no "end point." *Id.* at 225. Kamehameha has employed a 100% racial quota in admissions for nearly 150 years. It did not change its use of race after the Supreme Court decided *Harvard*. Its only meaningful change came around 2002 when, after one non-native was admitted, Kamehameha *increased* its use of race by ensuring the number of qualified native applicants would always exceed the number of seats. *Supra* ¶32. Kamehameha also says its racial preference will end only after native Hawaiians no longer face disparities in education. *E.g.*, *Doe I*, 470 F.3d at 846. That supposed end point, as the Supreme Court held in *Harvard*, is no end point at all. *See* 600 U.S. at 225, 213, 230.

d. Kamehameha engages in racial "stereotyping." *Id.* at 220. It does not give a preference based on educational disadvantage; it uses native Hawaiian ancestry as a proxy for educational disadvantage. *Id.* at 220-21. Kamehameha would admit a wealthy native Hawaiian whose parents both have PhDs, for example, over a poor non-native Hispanic whose parents never graduated from high school.

e. Kamehameha's overarching goal of "redress[ing] the under-representation of Native Hawaiians" by "increas[ing] the diversity of civic, business, and philanthropic leadership," 295 F. Supp. 2d at

1169, cannot be subjected to meaningful judicial review, *Harvard*, 600 U.S. at 214. While Kamehameha measures its own students' academic success, it educates only "a fraction of the Native Hawaiian school-age population." 295 F. Supp. 2d at 1169-71. "How many fewer leaders [Kamehameha] would create without racial preferences, or how much poorer the education at [Kamehameha] would be, are inquiries no court could resolve." *Harvard*, 600 U.S. at 215.

f.  Kamehameha cannot "articulate a meaningful connection between the means [it] employ[s] and the goals [it] pursue[s]." *Id.* Its definition of native Hawaiian is "arbitrary." *Id.* at 216. Because Kamehameha defines native Hawaiian to require only one native ancestor, it gives the same preference to a student whose mom is native (50% native Hawaiian) as a student whose great-great-great-great-great-great-great grandmother is native Hawaiian (0.2% native Hawaiian). No court could "scrutinize" whether Kamehameha's admissions preference accomplishes anything for native Hawaiians, defined at this meaningless level of generality. *Harvard*, 600 U.S. at 216.

g.  Kamehameha's use of race does not serve a compelling interest. Outside the context of prisons, the only compelling interest for using race is "remediating specific, identified instances of past

discrimination that violated the Constitution or a statute." *Harvard*, 600 U.S. at 207. Kamehameha is not trying to remedy "specific, identified" instances of past illegal discrimination. *Id.* The beneficiaries of its racial preference were not alive when the Hawaiian monarchy was overthrown, let alone suffered discrimination in educational opportunities that violated the Constitution or a statute; so Kamehameha's use of race is not tailored to "mak[ing] members of the discriminated class whole for the injuries they suffered." *Id.* at 215 (cleaned up). The non-native children who suffer from Kamehameha's discrimination today "'bear no responsibility for whatever harm'" native Hawaiians "'have suffered.'" *Id.* at 226.

h. Kamehameha has not reasonably considered and rejected race-neutral alternatives. *Fisher I*, 570 U.S. at 312. Kamehameha educates 5,400 native Hawaiians at a time. Given its astronomical wealth and land, *supra* ¶15, the school could educate the exact same number of native Hawaiians—while ending its totalizing racial preference—by admitting more students, adding more classrooms, or opening new campuses. Kamehameha has commissioned no study and issued no report explaining why it could not adopt these or other race-neutral alternatives. Any supposed educational benefits from segregation

would be too "'amorphous'" and unmeasurable to satisfy strict scrutiny. *Harvard*, 600 U.S. at 214-17, 224. Kamehameha claims to value, after all, "the interaction of diverse people and ideas" in its learning environments.

89.    Section 1981 contains no "affirmative action" exception that lets schools use race in contracting, at least without satisfying strict scrutiny. The Ninth Circuit's contrary holding in *Doe I* should be overruled.

a.  Section 1981 contains no exceptions at all to its ban on racial discrimination in contracting. Its "broad terms" bar discrimination "against, or in favor of, any race." *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 295 (1976).

b.  The Supreme Court has never recognized an affirmative-action exception to §1981. To the contrary, it holds that §1981 "guarantee[s] continuous equality between white and nonwhite citizens," *Jam v. Int'l Fin. Corp.*, 586 U.S. 199, 208 (2019), and protects the "equal right of all persons … to make and enforce contracts without respect to race," *Domino's Pizza v. McDonald*, 546 U.S. 470, 474 (2006) (cleaned up). The Supreme Court also recently held that §1981 uses but-for causation. *Comcast Corp. v. NAAOM*, 589 U.S. 327, 332 (2020). But-for causation is satisfied when race is a reason why the

plaintiff did not receive a contractual benefit, regardless of whether the defendant was acting under an affirmative-action plan. *See Harvard*, 600 U.S. at 289-90 (Gorsuch, J., concurring); *Bostock v. Clayton Cnty.*, 590 U.S. 644, 656 (2020).

c. Courts have reasoned that, in cases involving employment contracts, §1981 must contain an affirmative-action exception, or else employers could not meaningfully take advantage of the exception in Title VII. *E.g.*, *Setser*, 657 F.2d at 966. But that anticircumvention reasoning does not apply in cases, like this one, that do not involve employment contracts. And the Supreme Court has since rejected the notion that, because §1981 and Title VII overlap, courts can use that overlap to narrow either statute. *CBOCS W. v. Humphries*, 553 U.S. 442, 455 (2008); *accord Comcast*, 589 U.S. at 338 (stressing that Title VII and §1981 are "two statutes with two distinct histories"). Employees need not exhaust their §1981 claims with the EEOC, for example, even though they must do so when bringing identical theories of discrimination under Title VII. *Surrell v. Calif. Water Serv. Co.*, 518 F.3d 1097, 1103 (9th Cir. 2008). *See generally Metoyer v. Chassman*, 504 F.3d 919, 947 n.11 (9th Cir. 2007) (Bea, J., concurring in part and dissenting in part) (highlighting the many

- 31 -

reasons why "§1981 provides a much more attractive avenue of relief to plaintiffs than does Title VII").

d. Even for Title VII, the affirmative-action exception is either bad law or should be overruled. The Supreme Court's prior decisions rely on the supposed "purpose" of Title VII, devoid of any reliance on text. *See Weber*, 443 U.S. at 202 ("purpose of the statute"); *Johnson*, 480 U.S. at 630 (*Weber* "was grounded in … Title VII's purpose"). The Court used Title VII's supposed "'spirit'" to "rewr[i]te the statute." *Johnson*, 480 U.S. at 670 (Scalia, J., dissenting). The Supreme Court abandoned this approach to Title VII in *Bostock*, 590 U.S. at 654-55. Even more recently, the Supreme Court confirmed that Title VII "draws no distinctions between majority-group plaintiffs and minority-group plaintiffs." *Ames v. Ohio Dep't of Youth Servs*., 145 S.Ct. 1540, 1546 (2025).

90. Kamehameha's race-based admissions policy cannot satisfy strict scrutiny. It violates §1981.

## COUNT II
### Kamehameha's Admissions Policy Is Not a Valid Affirmative-Action Plan
### (42 U.S.C. §1981)

91. Plaintiffs incorporate and restate all their prior allegations here.

92. Even if §1981 contained an affirmative-action exception, that exception should be no broader than the one that exists under Title VII. If the goal is avoiding circumvention of Title VII, then the exception for §1981 should be *the same as* Title VII. And the Title VII standard makes defendants redress their own racial imbalances, rather than imbalances in society writ large, for good reasons. This requirement "provides assurance" that "race will be taken into account in a manner consistent with … eliminating the effects of employment *discrimination*" and that "the interests of those employees not benefiting from the plan will not be unduly infringed." *Johnson*, 480 U.S. at 632 (emphasis added).

93. The Ninth Circuit's contrary reasoning in *Doe I* was abrogated by the Supreme Court in *Harvard*. Citing *Grutter*, the Ninth Circuit justified a laxer test based on "'educational autonomy'" and "deference to private educational decisionmakers." 470 F.3d at 841. But in *Harvard*, the Supreme Court held that *Grutter*'s discussion of "deference" does not justify weakening the legal standard that governs the use of race in education. 600 U.S. at 217. Also citing *Grutter*, the Ninth Circuit justified a laxer test based on schools' legitimate interest in producing diverse citizens, workers, and leaders. 470 F.3d at 841. But in *Harvard*, the Supreme Court rejected those interests as amorphous, standardless, unmeasurable, and illegitimate racial balancing. 600 U.S. at 214-15, 223-25.

- 33 -

94.    Kamehameha cannot satisfy the affirmative-action exception from *Johnson* and *Weber* for several reasons, including:

    a.  Kamehameha cannot prove a manifest balance in the proportion of native Hawaiians in its student body compared to the proportion of school-aged native Hawaiians in the State. Native Hawaiians are severely overrepresented at Kamehameha. As Kamehameha admitted during the prior litigation, "Kamehameha's preference policy is not an affirmative action program, designed to mirror societal diversity within an institution."

    b.  Kamehameha's policy totally excludes non-native students in effect and by design, *supra* ¶¶30-34, so it creates an absolute bar to their advancement. That bar has become more clearly absolute since 2002, when *Doe I* was filed. *Supra* ¶¶33-34. That non-natives can attend "other" schools is "no response" to Kamehameha's complete exclusion of non-natives. *Fearless Fund*, 103 F.4th at 777. "Not only is that position anathema to the principles that underlie all antidiscrimination provisions," but it would "render *Johnson*'s 'absolute bar' caveat a nullity." *Id.*; *cf. Weber*, 443 U.S. at 208 (asking whether whites could participate "in the program" being

challenged); *Johnson*, 480 U.S. at 638 (asking whether men could be promoted under "the Plan" being challenged).

c. Even if it were not an absolute bar, Kamehameha's "rigid," sequencing-based quota unnecessarily trammels non-natives' rights. *In re Birmingham*, 20 F.3d 1525, 1541-43 (11th Cir. 1994). This "hardcore, cold-on-the-docks quota" is precisely what *Weber* and *Johnson* distinguished as illegal. *Hammon v. Barry*, 826 F.2d 73, 79 (D.C. Cir. 1987); *cf. Johnson*, 480 U.S. at 638 (stressing that "the Plan sets aside no positions for women" and "requires women to compete with all other qualified applicants"); *Weber*, 443 U.S. at 208 (stressing that "half" the recipients would be "white").

d. Kamehameha's use of race has no meaningful end date. Its exclusion of non-natives is nearing its 140th year, with no sign of stopping. In a statement released in response to *SFFA I*, Kamehameha said it is "prepared and committed to vigorously defen[d]" its "nearly 140-year-old admissions policy," "[j]ust as we did decades ago." Kamehameha also offered a defense solely based on Pauahi's will—making points that not even the Ninth Circuit accepted in *Doe I*. Its sole defense of its current policy adopts a rationale that justifies the use of race indefinitely:

**Is your admissions policy discriminatory?**

No. Kamehameha Schools is a private trust established in the Kingdom of Hawai'i to implement the will of a Native Hawaiian chiefess. The trust is entirely privately funded, receiving no state or federal financial assistance. The United States government should not be interfering with the business of a private trust's ability to implement the kauoha of a high-ranking Hawaiian Kingdom chiefess.

95.   At the very least, Kamehameha can no longer satisfy the version of the affirmative-action exception articulated by the Ninth Circuit in *Doe I*. Among other reasons:

a.   The Ninth Circuit required Kamehameha to justify its race-based admissions policy based on "current" data showing a manifest imbalance in educational outcomes for native Hawaiians. 470 F.3d at 843; *accord, e.g.*, *id.* ("presently"); *id.* at 842 ("present" and "presently"); *id.* at 844 ("currently"). Kamehameha has not done so. It has not published a report on that question since 2021, relying on data no more recent than 2018. *Supra* ¶50. Even those numbers are outdated to the point of uselessness, since they do not account for the massive effects of school closures and remote learning in the wake of COVID-19.

b.   The Ninth Circuit assumed that Kamehameha's racial preference is "limited" because non-natives can be admitted "if qualified students

with Native Hawaiian ancestry do not apply in sufficient numbers." 470 F.3d at 845-46. But after *Doe I* was filed, Kamehameha made changes to its admissions process to ensure that never happens. *Supra* ¶¶33-34.

c. The Ninth Circuit assumed that Kamehameha would adjust its racial preference based on "changes" in "the capacity of the School's programs" and "the well-being of the Native Hawaiian community" in education. 470 F.3d at 846. Since *Doe I*, Kamehameha reports that educational imbalances for native Hawaiians have improved in several areas, *supra* ¶50, and Kamehameha has increased its enrollment by 600 students, *supra* ¶17. Yet Kamehameha has not decreased its racial preference one iota.

d. The Ninth Circuit held that Kamehameha's use of race needed no "explicit or immediately foreseeable end date," stressing that *Grutter* allowed universities to use race for another 25 years. 470 F.3d at 846. But in *Harvard*, the Supreme Court held that "*Grutter* did no such thing." 600 U.S. at 228; *accord id.* at 224. The holding of *Grutter*, it explained, is that "race-based admissions programs eventually had to end" and that the lack of a logical and durational end point is fatal. *Id.* at 225; *accord id.* at 369 (Sotomayor, J., dissenting)

(explaining that, per the *Harvard* majority, "everyone … has been misreading *Grutter*"). *Harvard* also explained that any 25-year clock from *Grutter* has expired. *Id.* at 225. And yet Kamehameha's race-based admissions policy remains unchanged.

e.  The passage of another 20 years also shows that Kamehameha's racial preference is not "necessary to correct the manifest imbalance suffered by students of Native Hawaiian ancestry." *Doe I*, 470 F.3d at 845. While Kamehameha's report suggests that educational outcomes for native Hawaiians have improved in several areas, so have educational outcomes for all students in Hawaii. *Supra* ¶50. And some of the metrics that the Ninth Circuit relied on—reading scores and absenteeism—have gotten worse. *Supra* ¶50. Meanwhile, the population of school-aged native Hawaiian children in Hawaii increased from 70,000 to over 86,000—meaning Kamehameha serves a smaller percentage of native Hawaiians today than during *Doe I*. *Compare* 470 F.3d at *832, with 2021 Ka Huakai* 339. This data confirms that there simply is no causal relationship between Kamehameha's race-based admissions policy and the educational achievement of native Hawaiians as a whole. *See 2021 Ka Huakai* 335 ("Sadly, achievement gaps between Native Hawaiians and other

major ethnic groups are enduring …. Educational reforms move the needle only so far and do not always attend to broader societal inequities").

f. In *Doe I,* "nothing in the record" suggested that "educational opportunities in Hawaii are deficient for students, like Plaintiff, who lack any native Hawaiian ancestry." 470 F.3d at 844. That record exists, certainly today if not 20 years ago. A comprehensive report published in 2025 ranked Hawaii's public schools 42nd in the country. Another report from late 2024 found that "Hawaii's public schools are chronically underfunded," ranking 39th in expenditures despite having one of the nation's highest costs of living. In a September 2025 study of educational innovation in private and public schools, Hawaii ranked 44th out of 50 States. A 2023 study by the CDC reports that students experience much higher levels of racism in Hawaii schools compared to the national average—with black and white students experiencing the highest levels of racism (55% and 47%) and native Hawaiians experiencing the lowest levels of racism (34%).

96.   Kamehameha's race-based admission policy is not a valid affirmative-action plan. It violates §1981.

- 39 -

## COUNT III
### A Statutory Carveout Would Be Unconstitutional
### (42 U.S.C. §1981; U.S. Const. amends. V & XIV)

97.   Plaintiffs incorporate and restate all their prior allegations here.

98.   After holding that Kamehameha's admissions policy was a valid affirmative-action plan, the Ninth Circuit's 2006 opinion had another section titled: "Alternatively, and in Addition, Congress Specifically Intended to Allow the Kamehameha Schools to Operate When, in 1991, It Re-enacted 1981." *Doe I*, 470 F.3d at 847.

99.   The scope of this alternative holding is not clear.

100.   On the one hand, this holding might have been an alternative reason why §1981 contains an affirmative-action exception (and why that exception is laxer than the one that applies to employers under Title VII). After discussing various statutes involving native Hawaiians and education, the Ninth Circuit said those statutes simply "inform our analysis"—*i.e.*, the affirmative-action analysis that the court undertook in the prior section. 470 F.3d at 849. Under this reading of the opinion, Kamehameha's race-based admissions policy is carved out of §1981, but only insofar as it satisfies *Doe I*'s requirements for a valid affirmative-action plan.

101.   On the other hand, the Ninth Circuit might have held that race-based admissions policy like Kamehameha's are carved out of §1981 entirely. The title of this section says it's an "Alternativ[e]" and "Addition[al]" reason why Kamehameha

wins, presumably apart from the earlier section that discussed the affirmative-action exception. 470 F.3d at 847. And its conclusion states that the "the *most plausible reading* of §1981" is that the statute does not bar "a preference for Native Hawaiians, in Hawaii, by a Native Hawaiian organization, located on the Hawaiian monarchy's ancestral lands." *Id.* at 849 (emphasis added). Under this reading of the opinion, §1981 cannot apply to race-based admissions policy like Kamehameha's, regardless of whether the school's preference for native Hawaiians satisfies *Doe I*'s test for a valid affirmative-action plan.

102.   If §1981 has a carveout for certain preferences "for Native Hawaiians," *id.*, then that carveout is unconstitutional. The carveout is a racial classification: It treats a discriminator that prefers to contract with one race (native Hawaiians, *see Rice*, 528 U.S. at 517) differently from a discriminator that favors other races. *See McLaughlin v. Florida*, 379 U.S. 184, 194 (1964); *Ames*, 605 U.S. at 318, 314 n.1 (Thomas, J., concurring). So, too, if Congress specifically intended to give certain private schools the "right to discriminate" in favor of native Hawaiians. *Reitman v. Mulkey*, 387 U.S. 369, 381 (1967). Racial classifications by Congress must satisfy strict scrutiny—a test that's no less strict than the one that governs the States. *Adarand Constructors v. Peña*, 515 U.S. 200, 224, 235 (1995). As explained, strict scrutiny cannot be satisfied here. *Supra* ¶88.

103. Under principles of severability, courts would deem this exception for native Hawaiians unconstitutional and severable. The proper approach is to refuse to enforce the exception while leaving the broader §1981 in place. *See Barr v. AAPC*, 591 U.S. 610, 630-34 (2020).

104. More simply, the Ninth Circuit's statutory analysis in *Doe I* should be rejected. It uses an approach to statutory interpretation that courts have abandoned.

    a. Once Hawaii became a territory over a century ago, Kamehameha became subject to §1981. Congress amended §1981 in 1991, but those amendments added no exception to the statute—or even mentioned schools or preferences for native Hawaiians. With respect to Kamehameha, the 1991 amendments wholly strengthened §1981's ban on racial discrimination: The amendments clarified that §1981 covers "nongovernmental" discriminators, as well as discrimination that occurs before and after contract formation. §1981(c), (b); *see Rivers v. Roadway Exp.*, 511 U.S. 298, 302 n.2, 303 (1994) (discussing the 1991 amendments and how they "enlarged" the scope of §1981).

    b. The Ninth Circuit pointed to nothing in the text of §1981, before or after the 1991 amendments, to support a carveout for native Hawaiians. It relied on two unrelated statutes: the Hawkins-Stafford

Amendments (passed in 1988 and repealed in 1994) and the Native Hawaiian Education Act (passed in 1994 and reenacted in 2002). 470 F.3d at 848-49. Neither statute amends §1981, regulates private-school admissions, or does anything at all to the legal status of race-based contracting by Kamehameha.

105.   Instead of looking at what Congress wrote, the Ninth Circuit looked to the general policy goals of those other statutes to divine what Congress must have "had in mind," "intended," and "understood" when it amended §1981. 470 F.3d at 847-49. This approach to statutory interpretation is bad law. "Congress expresses its intentions through statutory text," so courts cannot entertain arguments about what Congress "*implicitly intended*." *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022); *accord Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Bonta*, 33 F.4th 1107, 1117 n.3 (9th Cir. 2022). Congressional "assumptions are not laws" and cannot add "language" to a statute that isn't there. *Id.* at 648. "When the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest. Only the written word is the law, and all persons are entitled to its benefit." *Bostock*, 590 U.S. at 653. That principle applies equally when the extratextual considerations are "alleged congressional intent divined from other statutes with very different language." *Corner Post v. Bd. of Gov'rs of Fed. Rsrv. Sys.*, 603 U.S. 799, 815 (2024).

**WHEREFORE**, Plaintiffs ask this Court to enter judgment in their favor and to provide the following relief:

a.  A declaratory judgment that Kamehameha's race-based admissions policy violates §1981.

b.  A permanent injunction prohibiting Kamehameha from knowing or considering applicants' race, including their native Hawaiian ancestry, when making admissions decisions.

c.  A declaratory judgment that Kamehameha must take all steps "necessary and proper" to desegregate "with all deliberate speed." *Brown v. Bd. of Educ.*, 349 U.S. 294, 301 (1955).

d.  Any equitable relief needed to undo Kamehameha's past discrimination, including an order barring Kamehameha from applying its rules governing the timing of applications or the location of applicants to past victims and an order requiring Kamehameha to admit E.S. and SFFA's other members.

e.  Compensatory and punitive damages to K.S. and E.S.

f.  Reasonable costs and expenses of this action, including attorneys' fees.

g.  All other relief that Plaintiffs are entitled to, including nominal damages of $1 for each lost opportunity to apply.

### DEMAND FOR JURY TRIAL

Per Rule 38(b), Plaintiffs demand a trial by jury on all issues so triable.

Dated: March 16, 2026

Thomas R. McCarthy*
Patrick N. Strawbridge
J. Michael Connolly*
Cameron T. Norris*
R. Gabriel Anderson*
Julius I. Kairey*
Ryan M. Proctor*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
patrick@consovoy mccarthy.com
mike@consovoymccarthy.com
cam@consovoymccarthy.com
gabe@consovoymccarthy.com
julius@consovoymccarthy.com
ryan@consovoymccarthy.com

Respectfully submitted,

/s/ *Jesse D. Franklin-Murdock*
Jesse D. Franklin-Murdock (10778)
SWEIGART MURDOCK, LLP
500 Ala Moana Blvd., Ste. 7400
Honolulu, HI 96813
Tel: (415) 873-0123
Fax: (877) 890-0791
jesse@sm-llp.com

Adam K. Mortara*
LAWFAIR LLC
40 Burton Hills Blvd., Ste. 200
Nashville, TN 37215
(773) 750-7154
mortara@lawfairllc.com

**pro hac vice* forthcoming

*Counsel for Plaintiffs*